1
2
3
4                          UNITED STATES DISTRICT COURT

5                        NORTHERN DISTRICT OF CALIFORNIA

6

7    BNF DISTRIBUTION ENTERPRISE,           Case No. 25-cv-08527-AMO
     INC.,
8                                           **ORDER RE PRELIMINARY
                     Plaintiff,             INJUNCTION**
9
            v.
10
     BA DISTRIBUTION, INC., et al.,
11
                     Defendants.
12

13          On December 22, 2025, the Court held a hearing on its order to show cause why the

14   temporary restraining order issued December 11, 2025 should not be converted to a preliminary

15   injunction.  Having considered the parties' papers, the arguments advanced by counsel at the

16   hearing, and the relevant legal authority, the Court **ENTERS** the preliminary injunction set forth

17   at the end of this order for the reasons explained below.

18   **I.      BACKGROUND**

19          **A.      Factual Background**

20                 1.      The Plaintiff

21          Since 2011, B N F Distribution Enterprise, Inc. ("BNF" or "Plaintiff") has been "engaged

22   in the highly competitive Central American food and beverage importation and distribution

23   business."  Dkt. No. 29 ("1st Fernández Decl.") ¶ 2.  According to its sole shareholder and Chief

24   Executive Officer, Nathalie Fernández, BNF's "core business consists of business-to-business

25   wholesaling and distribution to supermarkets, restaurants, and mom-and-pop stores throughout the

26   Northern California area, from Sacramento to Santa Cruz."  *Id.*  BNF "import[s] food products and

27   beverages from a list of wholesale vendors that [Fernández] and other members of management

28   have meticulously compiled, edited, and refined over almost 15 years in business."  *Id.* ¶ 3.  As

United States District Court
Northern District of California

United States District Court
Northern District of California

part of this process, BNF makes "frequent trips to Central America to research new products that [it] believe[s] would sell well in the markets [it] serve[s] and to stay 'ahead of the curve' to enable [its] customers to be among the first to bring desirable products to market in Northern California." *Id.*

BNF has "a confidential customer list that [Fernández] and other members of management have carefully compiled, edited, and refined over the years." *Id.* ¶ 4. The company has "a large and notoriously loyal customer base of over 400 active clients," comprising "10-15% of the Central American food and beverage market in Northern California[,]" "with the average client having purchased consistently from [BNF] for 6.5 years." *Id.* ¶¶ 2, 4.

"[R]eputation is key to [BNF's] ability to obtain new customers." *Id.* ¶ 4. It often acquires customers through "referrals and recommendations from [its] vendors and existing customers." *Id.* "Even when [BNF is] connected with a prospective customer through an existing relationship, [it] typically ha[s] to invest significant resources before making [its] first sale to the prospect." *Id.* This often includes "multiple visits to the site to demonstrate [BNF's] range of products and product knowledge," and "giv[ing] away promotional items so the prospective customer can find out whether the items will sell." *Id.* Typically, when [BNF] acquires a new customer it, "engage[s] in painstaking efforts, sometimes at a financial loss . . . to develop a strong, long-term relationship. These customer relationships typically end only if the customer closes, relocates, or changes ownership." *Id.* ¶ 5.

BNF sells the products it purchases from its vendors "to existing clients and to new clients using proprietary seasonal sales strategies that [Fernández] and other members of management have developed over the years. For some clients, [BNF] also provide[s] merchandizing services to help the client more effectively display and market the products, enabling them to achieve higher sales." *Id.* ¶ 6. BNF can provide these services because of its "cultivated knowledge of local market conditions and changes in demographics in each local market" and its "proprietary research and analysis of what sells in that specific location and in that specific neighborhood." *Id.* This is "a huge value-add service for [BNF's] clients that is only possible as a result of all of [its] confidential market research and customer analysis." *Id.*

BNF's "reputation for reliable, prompt, and quality service, and for [its] knowledge about products and [its] customers' markets, is apparent from [its] customers' loyalty." *Id.* ¶ 7.  Its "reputation is also demonstrated by the fact that, for some of [its] products, [BNF's] prices are higher than those charged by [its] competitors[,]" but BNF's customers are still "willing to pay a premium because they know [BNF's] unique knowledge and services help them succeed." *Id.*

BNF "own[s] and utilize[s] numerous lists, compilations, methods, techniques, processes, and other confidential, proprietary information in the day-to-day operation of [its] business," including:

- "Confidential customer contract information, including past, current, and prospective customer names and contact information compiled through internal research, years of industry involvement, and/or years of relationship management; confidential sales lead and sales call information and records; confidential information related to pricing, discount information, and payment terms offered to customers and potential customers; compilations of customer demands, preferences, feedback and needs; and previous discussions with customers regarding prior, current, and potential new sales campaigns and strategies ('Customer Information');"

- "Confidential sales reports containing detailed customer pricing information for specific customers, customer discounting information, and customer ordering information for Plaintiff's products ('Sales Information');"

- "Confidential delivery routes and schedules that [BNF] ha[s] developed and refined over many years and that are designed to, among other things, ensure that [BNF's] drivers' routes are as efficient as possible and that sales and delivery personnel arrive at each customer's site on the days and at the times likely to lead to the greatest sales ('Delivery Information');"

- Confidential market analysis and forecasting reports containing proprietary analyses of specific market trends, market pricing information trends, and target markets for selling Plaintiff's products based on market conditions and financial analysis ('Market Information');" and

- Confidential vendor contract information, including past, current, and prospective vendor names and contact information compiled through internal research and years of industry involvement; confidential information related to pricing, vendor quote history, discount information, and payment terms offered by vendors or potential vendors; analyses of vendor reliability, reputation, product offerings, and speed and accuracy of order fulfillment; and prior discussions with vendors concerning Plaintiff's prior, current, and potential new sales campaigns and strategies ('Vendor Information')."

*Id.* ¶ 8.  BNF considers these categories of information "to be trade secrets because the company derives significant value and a competitive edge by keeping that information secret, and because [it] takes great care to keep it secret." *Id.* ¶ 9.  It treats these types of information "as confidential business assets." *Id.* ¶ 10.  It "is not publicly available and is known only to a small group of trusted employees."[1]  *Id.*  BNF "strictly limit[s]" "[a]ccess to this information to management and [BNF] sales staff who require it to perform their duties." *Id.*  Its "digital records are stored on password-protected company computers and accounting systems (QuickBooks and related internal databases) that require individual logins." *Id.*  BNF's "warehouse and office are secured, and physical documents containing sensitive information are kept in locked filing cabinets or in restricted areas.  Pricing information is known only by 2 employees whom [BNF] ha[s] instructed not to disclose it." *Id.*  BNF also ensure[s] that competitors and customers seeking to learn about prices charged to other customers are screened out by, for example[,] requiring anyone inquiring about [BNF's] prices to complete an application." *Id.*  BNF does "not share this confidential information outside the company (other than with [its] accountant), and even within the company access to it is limited to certain internal staff with a legitimate need to know." *Id.* ¶ 11.

BNF "provide[s] verbal guidance to employees regarding the confidentiality and sensitivity of this information, as well as [its] expectations that all employees work diligently to safeguard this information." *Id.*  "[T]he secrecy of [BNF's] Customer Information, Sales Information, Delivery Information, Market Information, and Vendor Information is essential to [its] competitive advantage in the food distribution industry." *Id.* ¶ 12.  BNF has "spent almost 15 years building strong relationships with Latino supermarkets, restaurants, and mom-and-pop markets across multiple states." *Id.*  Its "knowledge of each customer's product preferences, buying patterns, and seasonal order cycles allows [BNF] to predict and anticipate demand, price competitively, and maintain consistent business.  If this information were public or accessible to competitors, they could easily replicate [BNF's] pricing, undercut [its] margins, and target . . . key accounts using [its] own operational insights." *Id.*  The data's secrecy "directly protects [BNF's]

---

[1] BNF has 7 full-time employees.  1st Fernández Decl. ¶ 2.

market position and allows [it] to continue providing reliable service and pricing to a loyal client base that has taken almost 15 years to develop." *Id.*

### 2. The Defendants

Defendant Jorge Barahona Castillo worked for BNF from approximately 2013 to September 29, 2025. Dkt. No. 21 ("1st Barahona Castillo Decl.") ¶ 2. While his title was "salesperson," Barahona Castillo "routinely performed many additional duties, including warehouse tasks, order preparation, and after-hours customer service." *Id.* His "work involved sales and servicing customer accounts, including frequent in-person store visits and ongoing communications with customers regarding what products they wanted, what they were willing to pay, and what competitors were offering." Dkt. No. 43-1 "(3d Barahona Castillo Decl.") ¶ 3.

After forming BA Distribution Inc. in early 2025, on September 15, 2025, Barahona Castillo resigned in writing from his position at BNF and gave two weeks' notice – through October 3, 2025.[2] 1st Barahona Castillo Decl. ¶ 3; Dkt. No. 33-1 ("2d Barahona Castillo Decl.") ¶ 5. He "openly disclosed that [he] intended 'to do something for [him]self and [his] family,' and that [he] had formed BA earlier in 2025." 1st Barahona Castillo Decl. ¶ 3. He "did not hide BA from BNF." *Id.* BNF asked Barahona Castillo "to remain employed through January 2026[,]" and he "agreed to continue at least through [his] notice period." *Id.* "On September 29, 2025—four days before [Barahona Castillo's] planned last day—BNF terminated him 'for cause.' " *Id.* ¶ 4.

### 3. The Alleged Misconduct

#### a. Plaintiff's version

According to Fernández, "[u]nbeknownst to [her] company," Barahona Castillo "has been using [BNF's] trade secrets to illegally compete against [BNF] for almost a year while also serving as [BNF's] full-time employee – all while telling [BNF] that he needed access to [BNF's]

---

[2] Barahona Castillo's resignation "was a shock" to Fernández because he "had been with [BNF] for over a decade and was such a trusted, key employee who had been given tremendous access to [BNF's] [t]rade [s]ecrets and other sensitive company information." 1st Fernández Decl. ¶ 24. Fernández confirms that Barahona Castillo had informed BNF he was resigning because he "wanted to do something for himself and his family." *Id.*

United States District Court
Northern District of California

trade secrets in order to do his job and purchase product on [BNF's] behalf in order to sell it to [BNF's] customers." 1st Fernández Decl. ¶ 13. She has "personally obtained evidence" showing Barahona Castillo:

> (a) using [BNF's] Trade Secrets to, among other things, identify customers, know their purchasing history and needs, know the price Plaintiff charged the customer and, thus, set a lower price he could charge to get the customer to purchase from him rather than [BNF], and know [BNF's] delivery routes and schedules so he could "beat" [BNF] employees to sales opportunities; (b) disparaging [BNF] in communications with [BNF's] customers and telling them that his competing company, . . . would be a better option to serve their business needs; (c) falsely telling [BNF's] customers that [it] didn't have the product they wanted but that he did and could sell it to them instead through his company; (d) quoting [BNF's] customers a false price for the product they wanted to buy from [BNF], and then telling the customer that he could sell it to them at a lower price through his company; and (e) using his company-provided cell phone and other company-provided equipment and resources during working time with [BNF] to do work for his competing company, including (1) selling product to and invoicing [BNF's] customers on behalf of his company, thus diverting payments to his company that should have gone to [BNF], and (2) purchasing product for his company from Plaintiff's vendors and customers.

*Id.*

Fernández provides the following examples of the above conduct. Barahona Castillo "accidentally left on his company iPhone two photos of invoices dated December 21, 2024." *Id.* ¶ 14 & Exs. A-B. Fernández "discovered these photos on" Barahona Castillo's "company-provided iPhone after [he] turned it in following his termination." *Id.* The invoices are from Barahona Castillo's company to BNF's clients, "Honduras Restaurant and Naples, for a sale that occurred while Defendant Barahona was employed by [BNF]. Many of the items shown on these invoices are not even stocked by [BNF][,]" which "shows that th[e] sale was not made on BNF's behalf." *Id.* BNF "never received the payments for these invoices." *Id.*

"[O]n or about March 7, 2025," Barahona Castillo "sold goods to, and provided an invoice to, [BNF's] customer El Mercadito Latino." *Id.* ¶ 15. The invoice was on "a form that had been provided to him by Plaintiff (or at least that was identical to forms provided by Plaintiff) for use in creating 'credit memos[,]' " which "are issued to reduce the amount a customer owes due to, for example, damaged goods having been delivered or a billing error in the seller's favor[.]" *Id.* BNF

"offers credit memos to its customers as part of its efforts to stay competitive and to keep its customers satisfied." *Id.*

A few days later, "[o]n March 11, 2025, El Mercadito Latino gave one of [BNF's] delivery drivers one of [BNF's] invoices, two credit memos [BNF] had issued – and an invoice from Defendant BA[,]" which the "customer believed was another of [BNF's] credit memos." *Id.* ¶ 16 & Ex. C. Following BNF's "standard procedures, the driver submitted the documents to BNF's accounting department, which, unaware of the customer's confusion, applied the amount to the customer's account." *Id.* ¶ 17. Once BNF discovered the error, its "accounting department reversed the credit related to Defendant BA's invoice and suspected that someone had tried to falsify a credit memo. This situation created additional work and stress for [BNF's] staff and risked disrupting [BNF's] relationship with El Mercadito Latino."

The next month, on April 8, 2025, Barahona Castillo gave another BNF client, El Borritracho, "an invoice for goods that he sold to them through his company." *Id.* ¶ 18 & Ex. D. Fernández found this photo on Barahona Castillo's "company-provided iPhone after he turned it in following his termination." *Id.* BNF "never received payment on these invoices." *Id.*

On July 25, 2025, Barahona Castillo "received a phone call on his personal cell phone that he recorded on his company-provided iPhone[,] . . . which he apparently forgot to erase before surrendering his company-provided iPhone to [BNF] following his termination." *Id.* ¶ 19. During the call, "[a BNF] customer asked Defendant Barahona, 'How much do you sell Taqueritos for?' [BNF's] customer then asked, 'And how much does BNF sell it for?' After a discussion regarding price, [BNF's] customer stated, 'OK, that's fine, I'll take yours then.' " *Id.*

On August 5, 2025, Barahona Castillo, through BA, sold $1,922.50 in goods to BNF's client, Panaderia Benedicion de Dios. BA kept the proceeds from that sale, as documented by a check that Fernández discovered on Barahona Castillo's "company-provided iPhone after he turned it in following his termination." *Id.* ¶ 20 & Ex. E.

On August 8, 2025, Barahona Castillo, through his company, sold goods to BNF's customer, Ola's Market. *Id.* ¶ 21. Fernández **"**discovered this when [she] met with the owner of Ola's Market, Ola Abdjoseph, who told [Fernández] the story of her dealing with Defendant

7

Barahona and his company." *Id.* Abdjoseph also gave Fernández a copy of the invoice Barahona Castillo had given her as well as a check she had written to Barahona Castillo in connection with a different transaction that had occurred on September 21, 2025. *Id.* & Exs. F, G. BNF "never received any payments for either of these orders." *Id.* The product Barahona Castillo sold to Ola's Market "was the exact same that [BNF] carr[ies] and that Defendant Barahona was supposed to be selling on behalf of [BNF]." *Id.* ¶ 22. Abdjoseph told Fernández that when she asked Barahona Castillo for BNF's product, he said "he could sell them the product at a better price – which he then did, using [BNF's] [t]rade [s]ecrets to know the price he had to 'beat' to make the sale." *Id.* "Defendants then kept the proceeds from the sale to Ola's Market rather than remitting those proceeds [BNF]." *Id.* Abdjoseph also told Fernández that "on multiple occasions over the course of approximately 8 months, Defendant Barahona had falsely told her that Plaintiff was out of certain products but that he could provide them to her through his separate company. She was upset that she had been deceived by an employee of Plaintiff." *Id.* ¶ 23.[3]

After Barahona Castillo's resignation, Fernández made additional "disturbing discoveries." *Id.* ¶ 25. She "discovered that Defendant Barahona had formed [a] competing company and registered it with the California Secretary of State back in early January 2025." *Id.* & Ex. H. She also learned that Barahona Castillo "had rented warehouse space in Hayward, presumably to store the product he had been purchasing, from [BNF's] vendors and clients, for his competing company to sell to [BNF's] customers." *Id.*

Fernández "personally observed" Barahona Castillo "illegally competing against [her] company." *Id.* ¶ 26. "[B]y sheer coincidence, she observed Defendant Barahona in his personal truck (or, in any event, a truck not owned by Plaintiff) on Interstate 880 heading towards San Jose." *Id.* This was during a workday for which Barahona Castillo received pay from BNF and on which BNF's "GPS system had tracked Defendant Barahona going home early[.]" *Id.* "Instead

---

[3] Abdjoseph confirms Fernández's account in her own declaration. She states that "[b]eginning sometime before August 2025, [Barahona Castillo] began telling [her] that BNF did not have some of the products [she] wanted to purchase in stock but that he could provide them through his separate company." Dkt. No. 36 ("Abdjoseph Decl.") ¶ 2. She also states that she would not have purchased them if Barahona Castillo "had not told [her] BNF could not provide them." *Id.* ¶ 3.

United States District Court
Northern District of California

United States District Court
Northern District of California

of Defendant Barahona going to Concord and Stockton that day, as [BNF] scheduled him to do, he skipped his Stockton stop and drove towards San Jose, which is where one of [BNF's] major clients, El Chapparal, is located." *Id.*

Suspecting that Barahona Castillo "was doing something inappropriate, if not illegal, a colleague and Fernández followed [him] to [BNF's] client's location in San Jose to take photographic and video evidence of his activity there." *Id.* ¶ 27 & Ex. I. Fernández "confirmed from photographs taken that Defendant Barahona arrived at El Chapparal in San Jose at 4:31 pm. Six minutes later, at 4:37 pm, photo and video evidence showed Defendant Barahona handing a white box of goods – identical to goods that [BNF] sell[s] – to an El Chapparal representative, who then brought the goods into their store." *Id.* "[A]t 4:40 pm, video evidence showed an El Chapparal representative bringing out three pallets of goods to Defendant Barahona – one of which was placed, by forklift, onto his truck, and the other two were transferred by hand onto the truck." *Id.* "[A]t 4:44pm, as a pallet was being loaded onto Defendant Barahona's truck, photo and video evidence showed an El Chapparal representative holding what appeared to be an invoice for Defendant Barahona." *Id.* "[A]t 4:55 pm, photo and video evidence showed Defendant Barahona loading onto his truck the exact same product that [BNF] sell[s]." *Id.* BNF "never received any payment for these sales." *Id.*

El Chaparral had been one of BNF's "most loyal customers for more than 14 years." *Id.* ¶ 28. It regularly purchased from BNF, accounting for "approximately $861,200 over 14 years." *Id.* BNF's "annual sales to El Chaparral exceeded $95,000 in both 2023 and 2024. It then ceased all purchasing from [BNF] immediately after Defendant Barahona's employment ended." *Id.* On September 25, 2025, a BNF employee "visited El Chaparral to attempt to establish contact as [BNF's] new sales representative." *Id.* The employee, Noel Chavez, reported to Fernández "that the store purchaser stated, in a tone that Mr. Chavez perceived as hostile, 'I don't care about your products[,] and I don't care about your prices.' The customer's tone made clear that he no longer wished to do business with Plaintiff." *Id.* Fernández is "informed and believe[s] that Mr. Chavez and other employees have had and continue to have difficult interactions with customers who have been targeted by Defendants." *Id.*

9

United States District Court
Northern District of California

1    On September 20, 2025, Barahona Castillo "delivered product on behalf of his company to

2    [BNF's] customer, Super Discount, at 8:20 am." *Id.* ¶ 29 & Ex. J. At 8:35 a.m., Barahona

3    Castillo "delivered product on behalf of his company to [BNF's] customer, Chapinlandia Bakery."

4    *Id.* ¶ 30 & Ex. K. At 9:21 a.m., Barahona Castillo "delivered product on behalf of his company to

5    Plaintiff's customer, Pacitas Bakery." *Id.* ¶ 31. At 9:56 a.m., Barahona Castillo delivered

6    "product on behalf of his company to [BNF's] customer, Magic Dulceria." *Id.* ¶ 31 & Ex. L.

7    At each of the stops made on September 20, 2025, Barahona Castillo "was delivering to

8    one of [BNF's] customers the exact same product that [BNF] sell[s]." *Id.* ¶ 32. Barahona

9    "invoiced the customer for the sale through his company and pocketed the proceeds, even though

10   he was [BNF's] employee." *Id.* BNF "never received any payment for any of the[] sales from this

11   date." *Id.* Following "review of the evidence and consultation with the company's attorneys,"

12   Fernández terminated Barahona Castillo on September 29, 2025. *Id.* ¶ 33. As she "continue[s] to

13   investigate the extent of Defendant Barahona's wrongful activity, [Fernández] continue[s] to learn

14   about more and more sales that he diverted from [BNF] – as his employer – to himself and his

15   company." *Id.* ¶ 34. She "also continue[s] to learn about all of the lost goodwill that [BNF has]

16   suffered as [she] talks to more and more upset customers." *Id.* Fernández has been "actively

17   reaching out to customers, explaining what has happened, and learning that many long-time

18   customers are upset with [BNF] because Defendant Barahona was frequently telling them falsely

19   that [BNF] did not have the product that they needed, even though they had previously always

20   purchased from [BNF]." *Id.* Fernández is "informed and believe[s] that many such customers are

21   contemplating, or already have, reduced their volume of business with BNF because of this

22   situation." *Id.*

23   Based on Fernández's "review of the company's books, as of last month . . . sales are down

24   by $790,000 this year-to-date compared to the same time in 2024." *Id.* ¶ 35. If these trends

25   continue, BNF's "revenue will end up being $1,082,000.00 lower in calendar year 2025 compared

26   to calendar year 2024." *Id.* Fernández "believe[s] that most, if not all, of [BNF's] lost revenue in

27   2025 is attributable to Defendant Barahona diverting sales that should have gone" to BNF." *Id.*

28   Fernández is "informed and believe[s] that Defendants are currently doing business with or

seeking to develop business with approximately 75% of [BNF's] active customers, and that

Defendant is using [BNF's] trade secrets – and in particular [BNF's] proprietary Delivery

Information – in soliciting such business." *Id.* ¶ 36.  Fernández is also "informed and believe[s]

that there is a significant risk that many of those customers are seriously considering ending their

business relationships with Plaintiff." *Id.*

        In addition, "Defendant Barahona and his company's use of a name confusingly similar to

[BNF's] – a name which was adopted after Defendant Barahona stole [BNF's] trade secrets –

[ha]s already caused actual confusion as to the source of the services being provided to [BNF's]

clients." *Id.* ¶ 38.  For example, "on October 8, 2025, one of [BNF's] customers, Casa Lucas #1,

handed [Fernández] two checks for two orders." *Id.*  "[O]ne of the checks . . . was made out to

Defendant Barahona's company." *Id.* & Ex. M.

        BNF "has suffered substantial harm, both financial and reputational, from Defendant

Barahona's theft of [its] trade secrets and [its] common law trademark."  1st Fernández Decl. ¶ 39.

Barahona Castillo "and his company are now direct competitors of [BNF], and they are using

[BNF's] trade secrets to undercut [BNF's] pricing and divert sales from [BNF] customers to

themselves." *Id.*

        BNF's Operations Manager, Derrick Troupe, adds that BNF's "operations rely on (among

other things) established, confidential delivery routes and schedules that [BNF] ha[s] developed

and refined over many years."  Dkt. No. 30 ("Troupe Decl.") ¶ 2.  These "are not public . . . and

are known only to Plaintiff's staff.  Competitors do not have access to this information." *Id.*

Access is restricted even to customers, who "know in advance only which day Plaintiff will be

making a delivery so they can coordinate logistics." *Id.*  While he worked for BNF, Barahona

Castillo "was entrusted with full knowledge of virtually all of [BNF's] confidential and

proprietary information, including but not limited to [BNF's] customer base, routes, and delivery

schedules.  This information was provided to him strictly in the course of his employment to

enable him to perform his duties as a salesperson and assist in coordinating deliveries." *Id.* ¶ 3.

        Since launching BA, Barahona Castillo "has been using his insider knowledge of

Plaintiff's routes and delivery schedules to strategically visit customers one to two days before

1    Plaintiff's scheduled deliveries.  This pattern has occurred repeatedly across multiple accounts that

2    he serviced during his employment with Plaintiff."  *Id.* ¶ 4.  By doing this, Barahona Castillo can

3    "solicit orders from [BNF] customers for identical products, effectively intercepting sales that

4    Plaintiff would have otherwise completed.  Customers have told [BNF] that he 'comes earlier

5    now,' and some have indicated that they purchase from him even when his prices are higher than

6    Plaintiff's because they can receive the products sooner."  *Id.* ¶ 5.  Because "the customers'

7    purchasing budgets are tied up with [BA,] . . . limited or no funds [are left] for the customers to

8    place orders with Plaintiff later in the week."  *Id.* ¶ 6.

9         Customers now feel that BNF is "arriving 'too late' to service them," departing from "their

10   previously held view that Plaintiff was reliable and provided prompt, timely service."  *Id.*  BNF

11   "has spent many years working to cultivate that reputation."  *Id.*  Troupe is "informed and

12   believe[s] that [BNF's] reputation has been significantly damaged in the months since Defendants

13   began their competing operation."  *Id.*  He is also "informed and believe[s] that this damage has

14   been a direct result of Defendants' misappropriation of Plaintiff's delivery route and scheduling

15   information."  *Id.*  "This practice by Defendants has not only deprived Plaintiff of the revenues

16   from those customers' sales and tarnished Plaintiff's reputation but has substantially damaged, and

17   threatens to destroy, the competitive advantage that Plaintiff developed by spending years creating

18   and refining its proprietary internal scheduling system."  *Id.* ¶ 7.

19                    ***b.***    ***Defendants' version***

20        Barahona Castillo "never signed any non-compete, non-solicitation, confidentiality, or

21   nondisclosure agreement with BNF."  2d Barahona Castillo Decl. ¶ 8.  He was never given "an

22   employee handbook or any written trade-secret/confidentiality policies[.]"  *Id.*  Nor did he receive

23   any "training about protecting trade secrets."  *Id.*

24        When his employment with BNF ended, Barahona Castillo "did not take, download, or

25   copy any electronic or physical customer lists, pricing sheets, routes, strategy documents, or

26   similar materials."  2d Barahona Castillo Decl. ¶ 9.  At the time of separation, Barahona Castillo,

27   "returned BNF's property."  *Id.*  "Any knowledge [Barahona Castillo] ha[s] about stores, products,

28   and pricing comes from (a) [his] own experience working in this industry for many years and

United States District Court
Northern District of California

(b) relationships that [he] personally developed over time[,]" specifically, "over 12 years in the field." *Id.*; 1st Barahona Castillo Decl. ¶ 6.

Barahona Castillo "ha[s] not used or disclosed any BNF 'trade secret.' "  1st Barahona Castillo Decl. ¶ 7.  "The types of information that Plaintiff now describes as 'trade secrets' . . . are widely known in the marketplace.  Many distributors, sales representatives, and store owners share this information, vendors send their own promotional materials, and prices are easily compared." 2d Barahona Castillo Decl. ¶ 10.  Barahona Castillo has "not accessed or used any confidential database or secret report from BNF to operate BA." *Id.*  He has no " 'Delivery Information,' 'Market Information,' or 'Vendor Information' in his possession." *Id.* ¶ 11.  He plans his "routes and ordering based on [his] own judgment, the location of [his] current customers, and the products [he is] able to purchase lawfully from vendors." *Id.*  He does not "drive around trying to 'beat' BNF to its customers using any secret schedule, and [he] do[es] not have such a schedule."[4] *Id.* ¶ 11.

BNF's assertions that its "vendor/customer information and sales practices as 'confidential,' 'proprietary,' or the product of 'secret research' . . . do not match the reality of how business is done in this industry and how [Barahona Castillo's] work was actually performed."  3d Barahona Castillo Decl. ¶ 6.  "[N]o work [was] done to undertake any such secret research." *Id.* "[T]he idea that there is a secret, highly proprietary 'vendor list' created through 'frequent trips' is inaccurate as [Barahona Castillo] observed it.  BNF customers and products are widely known and widely shared with dozens of Brokers; and product sourcing is driven by availability and price, which changes over time." *Id.* ¶ 8.  The identities of vendors "are not confidential." *Id.*  Barahona Castillo "did not see a guarded, restricted-access 'vendor list' that was treated like a trade secret, nor was [he] trained that such a list existed and needed special secrecy protections." *Id.* ¶ 9.

---

[4] When Barahona Castillo worked for BNF, "[m]any customers did not have a set schedule; they placed orders when they were running low on items, and delivery timing depended on inventory levels, customer requests, and operational realities."  3d Barahona Castillo Decl. ¶ 30. Barahona Castillo asserts that "[r]oute planning in this industry is ordinary logistics and customer service, not a protected trade secret." *Id.*

The assertion that "BNF sells to customers on a 'confidential customer list' and that BNF "has a 'large and notoriously loyal customer base' " "does not match [Barahona Castillo's] experience." *Id.* ¶¶ 10-11. "In the Central American/Latino grocery distribution space, the customer base is not secret. Stores are publicly visible and readily identifiable by anyone in the industry (driving neighborhoods, public listings, referrals, and ordinary sales activity). Distributors routinely learn about customers through ordinary market activity and relationship-building, not through 'confidential lists.' " *Id.* ¶ 11. In addition, "[c]ustomers in this industry do not purchase exclusively from one distributor. All of the stores with whom Barahona Castillo dealt[] purchased the same category of products from multiple distributors at the same time, and . . . split their weekly orders based on who c[ould] provide (a) the best price, (b) the best availability, and (c) the quickest delivery for a particular product on a particular week." *Id.* ¶ 12.

Throughout his employment, Barahona Castillo "personally obtained and maintained accounts primarily through door-to-door sales, store visits, relationship-building, and referrals from store owners and managers." *Id.* ¶ 13. Customers regularly informed Barahona Castillo that "they were comparing multiple suppliers and buying from whoever offered the lower price or had the item in stock. This 'free-for-all' competitive reality is inconsistent with the claim that customer identities and relationships are protected by a 'confidential customer list.' "[5] *Id.*

The claimed proprietary seasonal sales strategies developed by BNF management, and assertion that merchandising and sales rely on confidential market research and customer analysis,

---

[5] In Barahona Castillo's experience, "customers generally have little loyalty to any one distributor. They are highly price-sensitive and will buy from whomever offers the lower rate or better availability. Even customers who had bought from BNF for years would frequently purchase the same or similar products from other distributors when the other distributor's price was lower or the product was more readily available." 3d Barahona Castillo Decl. ¶ 19. "Customers frequently asked [Barahona Castillo] for pricing and availability and made clear directly and indirectly that they would buy from whichever distributor offered the best combination of price and immediate supply." *Id.* ¶ 22. "If a product was available elsewhere at a lower cost, or if BNF did not have the product on hand, customers would often buy it from another distributor. In other words, purchasing decisions were driven primarily by price, availability, and customer service, not by 'loyalty' to BNF or any claimed premium-value services." *Id.* ¶ 23. "Customers order what they want, when they want, and choose suppliers based on price and availability." 1st Barahona Castillo Decl. ¶ 18.

United States District Court
Northern District of California

including analysis of local demographics and what sells in a specific neighborhood, "is not accurate based on [Barahona Castillo's] personal knowledge and experience inside BNF." *Id.* ¶¶ 14, 15. He "was not provided written 'proprietary seasonal sales strategies,' confidential demographic studies, neighborhood-by-neighborhood analysis documents, or internal 'market research reports' that drove [his] daily sales work." *Id.* ¶ 15. In Barahona Castillo's experience, "what sold in a given store was determined by what [he] observed personally in the store, customer conversations, and basic common-sense retail realities (shelf space, what customers were asking for, what items were moving, and what competitors were offering)." *Id.* ¶ 16. He "learned what worked by visiting stores, looking at the shelves, speaking to owners/managers, and responding to their requests, not by receiving secret management-created research." *Id.* To the extent Barahona Castillo "was successful maintaining accounts, it was largely due to [his] customer service responsiveness, reliability, and relationships, not because BNF had secret 'proprietary strategies' or unique confidential research that justified a premium price." *Id.* ¶ 20.

With respect to claimed "confidential customer contract information," "confidential sales leads," and customer names and contact information compiled through "internal research," years of involvement, and relationship management, Barahona Castillo states that "[i]n [his] experience, BNF's customer base in this industry was not secret and was not created through 'internal research.'" *Id.* ¶ 27. He "personally obtained and maintained many accounts by going door-to-door to stores on [his] route, introducing BNF's products, leaving [his] business card, and following up." *Id.* "Customers also referred [him] to other store owners and managers[,]' which "are publicly visible and readily ascertainable to any distributor through ordinary sales efforts." *Id.* Barahona Castillo adds that BNF "serves virtually every Hispanic and Latino store in the relevant market area." 1st Barahona Castillo Decl. ¶ 17. These "customers are well known to anyone in the distribution business, and their identities are not confidential." *Id.* Barahona Castillo "did not use any secret information or list to identify customers." *Id.* He "already knew who they were from years of working in the same open marketplace." *Id.*

To the extent BNF maintained "confidential sales reports containing detailed customer pricing information," discounting information, and ordering information for specific customers"

Barahona "did not receive or review any "confidential sales reports" of the kind described as a management-created trade secret report." 3d Barahona Castillo Decl. ¶ 29. Barahona Castillo's "sales work depended on ordinary invoicing, customer communications, product availability, and the practical reality of what each customer wanted and was willing to pay. If BNF maintained reports within accounting software, those would reflect routine business records—not secret 'proprietary' reports—and customers often knew or inferred pricing differences because they compared distributors and routinely discussed competitor pricing."[6] *Id.*

In his time at BNF, Barahona Castillo did not see "confidential market analysis and forecasting reports with proprietary analyses of market trends, pricing trends, and target markets based on financial analysis." *Id.* ¶ 31. "Sales decisions were driven primarily by common-sense observation in the field what stores were asking for, what products were moving, what customers reported they could purchase elsewhere, and what was available from suppliers. If any informal discussions occurred about trends, that is normal knowledge in the trade and not the product of confidential forecasting reports as described." *Id.*

Although "BA was registered in January 2025," Barahona Castillo "did not begin meaningful operations until around February 2025 and only in a small way. BA has approximately 30 active customer accounts[,]"[7] whereas "BNF services roughly 250 stores in the same region[,]" and "BNF continues to service the same customers in [the] area." 1st Barahona Castillo Decl. ¶¶ 8, 10. BA's product offerings are "limited and not identical to BNF's. With very few exceptions (approximately seven overlapping SKUs), the products [BA] carr[ies] are different from those BNF sells." *Id.* ¶ 9. If "an item overlaps (e.g., common snacks), it is a widely available product that many distributors can lawfully buy and resell." *Id.* "Stores frequently split their orders among multiple distributors based on price, availability, and service."

---

[6] In any event, Barahona Castillo explains that he "cannot sell products for less than Plaintiff because [he] simply do[es] not have Plaintiff's purchasing power or volume discounts." 1st Barahona Castillo Decl. ¶ 18. His "prices are based on what [he] pay[s] [his] own suppliers, not on any inside knowledge of BNF's prices. *Id.*

[7] In a later-filed declaration, Barahona Castillo indicates that "BA has approximately 70 customers at most[.]" 3d Barahona Castillo Decl. ¶ 46.

United States District Court
Northern District of California

1    *Id.* ¶ 10.

2        Barahona Castillo has "never represented BA as affiliated with BNF, and to [his]

3    knowledge no customer has paid BA believing it was BNF."  *Id.* ¶ 11.  Barahona Castillo "cannot

4    practically compete outside the Latino foods channel because [he] do[es] not have the product

5    lines, licensing, or relationships needed for big-box or unrelated industries."  *Id.* ¶ 12.  Barahona

6    Castillo can only sell to "Central American owned markets, because that is the specific industry in

7    which [he] ha[s] worked for more than 12 years."  *Id.* ¶ 13.  It "is a small and specialized market,

8    and all distributors in this field sell to the same types of retail stores.  It is normal and expected

9    that Hispanic markets purchase from multiple distributors at the same time based on price,

10   availability, and service."  *Id.*  Barahona Castillo "cannot legally or practically sell to big box

11   stores or unrelated industries because [he] do[es] not have those products, licenses, or business

12   relationships.  If [he] were prohibited from selling to Hispanic markets, [he] would have no

13   customers at all and would be completely unable to earn a living in [his] trade."  *Id.*  It "would

14   effectively ban [him] from working in the only profession [he] know[s]."  *Id.*  This "would shut

15   BA down and deprive [his] family of income."  *Id.* ¶ 16.

16       Barahona Castillo explains that "[a]ny BA-related activities [he] performed while still

17   employed at BNF occurred during off-duty hours (evenings or weekends) or on days off.  [He] did

18   not divert BNF orders or use BNF resources for BA."  *Id.* ¶ 14.  This includes some of the

19   transactions BNF witnessed on September 20, 2025, a Saturday.  *Id.*  While employed at BNF,

20   Barahona Castillo had "extremely long workdays (often 12–14 hours), frequent weekend or late-

21   night tasks," and used his "personal vehicle and cell phone for business."[8]  *Id.* ¶ 15.  He "was not

22   properly reimbursed for necessary expenses for extended periods, and [he] was often unable to

23   take meal or rest breaks due to workload."  *Id.*  He believes he has "significant wage-and-hour

24   claims arising from misclassification and unpaid premiums/reimbursements."  *Id.*

25       Barahona Castillo disputes BNF's contention that he "disparaged BNF in communications

26

27   _____

28   [8] "[O]n September 18th[,] 2025, [Barahona Castillo] started working for plaintiff at three in the
     morning and worked until three in the afternoon.  Thereafter on [his] own time [he] drove [his]
     private company truck to San Jose."  1st Barahona Castillo Decl. ¶ 22.

1    with its customers or told them that [he] could better serve their business needs." *Id.* ¶ 19.  He has

2    "never spoken negatively about BNF or said anything disrespectful about them." *Id.*  He "simply

3    sell[s] products that BNF does not carry or cannot supply at the time." *Id.*  His focus is "on

4    promoting his own products, not criticizing BNF." *Id.*

5        Barahona Castillo disputes BNF's contention that he "told customers BNF did not have

6    certain products so that [he] could sell those products through BA." *Id.* ¶ 20.  "If [he] ever told a

7    customer that BNF did not have an item, it was because BNF actually did not stock that product or

8    was out of inventory at that time.  In those instances, [he] offered different products that BA

9    legitimately carried." *Id.*  On several occasions, "stores reached out to [Barahona Castillo]

10   because they believed BNF had stopped servicing them or had failed to timely deliver requested

11   products." 3d Barahona Castillo Decl. ¶ 38.  His business with "any store was based on customer

12   requests and lawful competition, not theft of trade secrets." *Id.*

13       Barahona Castillo disputes BNF's contention that he "used its cell phone or other

14   equipment to handle BA-related work, including selling products and diverting payments to BA."

15   1st Barahona Castillo Decl. ¶ 21.  BNF gave Barahona Castillo "only one company cell phone,

16   and [he] did not delete any messages from it.  There were two BA-related invoices that appeared

17   on that phone, but those were not sent to any BNF customers — he sent copies of those invoices to

18   his own personal phone for recordkeeping." *Id.*  He "never used BNF's phone, time, or resources

19   to handle BA's sales or divert payments.  All BA work was done using [his] personal phone and

20   outside of BNF working hours." *Id.*  In addition to not using BNF's phones, he did not use

21   "trucks, warehouse, or other company resources to conduct BA business.  BA's sales and

22   deliveries are done using . . . [his] own vehicle, and [his] own time." 2d Barahona Castillo Decl.

23   ¶ 21.  Barahona Castillo does "not recall ever processing a BA order while [he] was supposed to

24   be working on BNF deliveries or routes." *Id.*

25       With respect to the naming of his company, Barahona Castillo chose "[t]he name 'BA

26   Distribution' . . .  because 'B' is the first letter of [his] last name, Barahona, and "A" is the first

27   letter of [his] wife's last name, Arce.  The name is simply a combination of [their] initials." *Id.*

28   ¶ 5.  Barahona Castillo did not name the company "to copy, trade off, or take advantage of

Plaintiff's 'BNF' name or any alleged mark." *Id.* ¶ 6.  At the time he formed BA, Barahona Castillo "understood that many companies in the distribution industry used short combinations of letters as their business names, often based on the owners' initials." *Id.*  He "did not intend for anyone to mistake BA for BNF, and [he] did not believe the names were confusingly similar." *Id.* Barahona Castillo has "never told any customer, vendor, or other person that BA was the same company as BNF, that BA was affiliated with BNF, or that BA was taking over BNF's routes or accounts." *Id.* ¶ 7.  "[N]o customer has ever told [Barahona Castillo] that they were confused about whether they were dealing with BA or BNF." *Id.*

As for the transactions BNF highlights in Fernández's declaration, Barahona Castillo states the following.  He "did not instruct Casa Lucas #1, or any of its owners or employees, to make out a check to BA for any order they believed was to BNF." *Id.* ¶ 12.  "To the extent Casa Lucas #1 issued a check payable to BA, that check represents payment for an order that Casa Lucas placed with BA, not with BNF." *Id.* ¶ 13.  Barahona Castillo "did not misrepresent [him]self or [his] company to obtain that payment." *Id.*  He has "never told Casa Lucas #1 that BA was BNF, that BA was acting on BNF's behalf, or that payments for BNF should instead be made to BA." *Id.* Barahona Castillo "was not involved in preparing or reviewing the accounting records that Ms. Fernández refers to in her declaration," has "no personal knowledge of how Casa Lucas #1 or BNF recorded those transactions in their books[,]" and cannot confirm "[a]ny statements in Ms. Fernández's renewed declaration about what Casa Lucas #1 'understood,' 'thought,' or 'intended.' " *Id.* ¶ 14.

Barahona Castillo has "never told Ola's Market that BNF was out of products when that was not true in order to steer business to BA." *Id.* ¶ 16.  He has "never lied to Ola's Market or any other customer about BNF's inventory in order to make a sale for BA." *Id.*  Any invoices Barahona Castillo "issued in the name of BA to Ola's Market were for orders that Ola's Market chose to place with BA." *Id.* ¶ 17.  Barahona Castillo "did not conceal the existence of BA," and "did not tell Ola's Market that these were BNF orders." *Id.*  "BA is a separate company[,]" and Barahona Castillo has "always presented it as such." *Id.*  Barahona Castillo disputes "Ms. Fernández's statements that [he] used '[t]rade [s]ecrets' to know the price that [he] needed to

'beat' for Ola's Market." *Id.* ¶ 18. To the extent Barahona Castillo "offered different prices than BNF, those prices were based on [his] own purchasing costs and business decisions." *Id.* He explains "[i]t is common in this industry for stores to tell distributors what price they are currently paying, and stores often negotiate better prices by comparing offers from multiple suppliers." *Id.*

Barahona Castillo has "not been shown all of the invoices and checks that Plaintiff attaches as Exhibits relating to Ola's Market." *Id.* ¶ 19. He "dispute[s] any suggestion that those documents reflect a secret or illegal scheme. To [his] knowledge, they simply reflect ordinary business transactions where Ola's Market decided to buy certain products from BA instead of BNF." *Id.* In Barahona Castillo's experience, "most of the stores in this industry purchase from multiple distributors at the same time. BNF continues to service many of the same customers, and any orders that BA receives are based on lawful competition, pricing, service, and product availability." *Id.* ¶ 22.

Barahona Castillo does "not believe that [his] continued operation of BA will cause irreparable harm to BNF. Their decrease in revenues can likely be attributable to the downturn in the economy."[9] *Id.* ¶ 23. He is "not threatening BNF's existence," and does "not control anywhere near the percentage of the market that BNF claims." *Id.* 45. Based on what Barahona Castillo has observed in the market, "distribution sales for imported Central American products declined due to broader conditions, including tariffs/import cost increases, inflation, and competitors. Sales were already down significantly while [he] worked at BNF. BA has a much smaller customer base than BNF, and many of BA's customers continue to buy from BNF and other distributors. BA is not in a position to cause the type of sweeping revenue impact Plaintiff claims." 3d Barahona Castillo Decl. ¶ 45.

///

---

[9] Barahona Castillo offers the declaration of Miguel Briseño, an employee from a BNF competitor, to corroborate this view. Briseño has "personally observed a significant downturn in sales activity in th[e] market," which he attributes to "broader market conditions affecting distributors and retailers, including increased costs and general inflationary pressures that have impacted customer purchasing behavior." Dkt. No. 43 ("Briseño Decl.") ¶¶ 5, 8. Fernández disagrees. *See* Dkt. No. 45.

United States District Court
Northern District of California

1

### c.    *Plaintiff's rebuttal*

2        In response to Defendants' submissions, Fernández's further declaration states the

3    following.[10]  Fernández considers "[t]he revenue decline BNF experienced in 2025 highly

4    abnormal."  Dkt. No. 45 ("2d Fernández Decl.") ¶ 5.  Since BNF's founding nearly 15 years ago,

5    it has "never before had a year-over-year decline in revenue."  *Id.*  Shortly after Defendants started

6    competing with BNF, "[s]udden changes in purchasing patterns by long-standing BNF customers

7    occurred."  *Id.*  "[S]ome of those customers have continued purchasing the same or similar

8    products from Defendants – even after entry of the temporary restraining order in this action."  *Id.*

9    For example, "on December 16, 2025 at approximately 9:54 a.m., [Fernández] personally

10   witnessed Defendant Jorge Barahona making a delivery to [BNF] customer Super Discount 99.

11   The items he was delivering are all items [BNF] ha[s] sold before October 1, 2025."  *Id.* ¶ 6 &

12   Exs. A-D.

13       Fernández explains that Barahona Castillo lacked visibility into BNF's importing

14   activities, "which were conducted and managed by owners and accountants.  The identities of all

15   of [BNF's] import vendors are/were never shared with any employees other than upper

16   management, because this information is confidential."  *Id.* ¶ 11.

17       In response to Barahona Castillo's contention that "BNF has not developed confidential,

18   proprietary information (as identified in the TRO) [or] trade secrets that give BNF a competitive

19   advantage," *id.* ¶ 13, Fernández responds that Barahona Castillo "admits *he did not see* internally-

20   produced reports or analyses – though he did often see the fruits of those analyses in connection

21   with his work, and that is the information he is using to unlawfully compete with BNF."  *Id.*

22   (emphasis in original).

23       Fernández adds that "[w]ith respect to customer data and customer loyalty, BNF tracks and

24   analyzes, e.g., customer ordering history, preferred SKUs, volume patters, credit terms, and it uses

25   these analyses in developing sales strategies that are communicated to sales representatives."  *Id.*

26   ¶ 14.  The company "made/makes decisions based on internally compiled knowledge of sales

27

28   _____
[10] The Court does not recite every statement on which the parties disagree and instead summarizes
only those material to the resolution of the instant dispute.

United States District Court
Northern District of California

trends over time, seasonable demand, and regional preferences." *Id.* This "helps solidify its

customer relationships, e.g., by providing product placement suggestions and by adjusting

offerings by store type. All of these decisions are made based on BNF's internal and proprietary

research and analysis." *Id.*

Of the customers that have purchased from BNF for many years, a number of them "rely

on BNF for consistent inventory, and [BNF] uses their purchase history – in combination with the

purchase history of other customers – to plan and effectively manage [its] inventory." *Id.* ¶ 15.

Barahona Castillo "was granted access to this information exclusively through a password-

protected sales application installed on his company-provided phone." *Id.* "With respect to

pricing and sales information, BNF uses confidential customer-specific pricing, discount tiers, and

individualized payment terms (e.g., COD or net). This pricing information is not publicly

available." *Id.* ¶ 16. The company also "generates internal customer sales summaries, margin

reports, SKU-level performance reports, and similar types of performance analyses honed over

many years and used in developing [BNF's] business strategies. These reports and analyses are

not accessible outside BNF personnel and cannot be recreated without internal access." *Id.* ¶ 17.

According to Fernández, Barahona Castillo "was not privy to some of the research and

trade secrets" she describes, "but he received sufficient outputs to give him a competitive

advantage." *Id.* ¶ 18. For example, Barahona Castillo "knew trade secrets such as which

customers [BNF] had determined it was in [the company's] best interests to offer discounts to, and

he knew exactly how low BNF was willing to set its prices for specific customers." *Id.* Barahona

Castillo also "did not see some of the confidential work and analysis that went into how BNF

operated it business[,]" but he did have "access to the results of those efforts, and that is what he is

using to compete." *Id.* ¶ 20. Further, Barahona Castillo "did not participate in, nor was he

exposed to, the confidential analysis, strategy, or internal planning that governed BNF's business

operations." *Id.* Rather "he was provided access only to the outputs of those efforts, solely for

purposes of carrying out his assigned role. He is now exploiting those outputs to compete against

BNF. This internal work was deliberately kept outside his scope, as part of BNF's intentional

compartmentalization of vital information[,]" which "was implemented specifically to discourage

1   and prevent the exact conduct at issue here." *Id.*

2       As for "delivery routes & scheduling, BNF developed (and continuously adjudged [*sic*]

3   and adapted) regular delivery days by region, optimized routes to save fuel and time, knowledge

4   of customers' preferred delivery timing – and the timing that resulted in the most revenue for

5   BNF." *Id.* ¶ 19.  "Any competitor having knowledge of [BNF's] delivery days, timing, and routes

6   – as Mr. Barahona does – would gain a clear operational advantage." *Id.*  Th[e] "information is

7   not public and is known to certain BNF employees and, to a lesser degree, the customers on a

8   specific route." *Id.*

9       Finally, in response to Barahona Castillo's "claims that several stores contacted him

10  because BNF stopped doing business with them or failed to service their accounts[,]" every store

11  "remains a current BNF customer." *Id.* ¶ 21.  They "informed BNF that they reached out to Mr.

12  Barahona solely because they were unaware that he was no longer employed by BNF, not to

13  purchase products from BA Distribution." *Id.*  BNF "believe[s] Mr. Barahona intentionally

14  abandoned his company-issued phone number upon forming BA Distribution in order to ensure

15  that customers would contact him personally after his departure, thereby exploiting confusion

16  about his continued affiliation with BNF." *Id.*

17      **B.    Procedural Background**

18      BNF commenced this action on October 6, 2025.  Dkt. No. 1 ("Compl.").  In the operative

19  amended complaint, filed October 8, 2025, BNF asserts claims for (1) breach of fiduciary duty,

20  (2) breach of the duty of loyalty, (3) trade secret misappropriation under the federal Defend Trade

21  Secrets Act ("DTSA"), 18 U.S.C. §§ 1836, *et seq.*, (4) trade secret misappropriation under

22  California's Uniform Trade Secrets Act ("UTSA"), Civil Code §§ 3426, *et seq.*, (5) trademark

23  infringement, (6) false designation of origin, (7) conversion, (8) unfair competition, (9) intentional

24  interference with prospective economic advantage, (10) intentional interference with contractual

25  relations, (11) theft under Penal Code § 496(c), (12) money had and received, (13) accounting

26  (14) restitution, and (15) declaratory relief.  Dkt. No. 6 ("FAC") ¶¶ 25-125.

27      On October 10, 2025, BNF moved for a temporary restraining order.  Dkt. No. 13.  At the

28  hearing held October 17, 2025, the Court denied the motion because Plaintiff had not adequately

United States District Court
Northern District of California

served Defendants before the hearing.  Dkt. No. 23.  On November 25, 2025, BNF filed a second

motion for a temporary restraining order.  Dkt. No. 27.[11]  Following briefing, the Court held a

hearing on December 8, 2025.  Dkt. No. 37.  At the hearing, the Court indicated it was inclined to

grant injunctive relief on the trade secret claim.  *Id.*  The Court directed the parties to meet and

confer on a potential joint proposed temporary restraining order and a briefing schedule on

whether a preliminary injunction should issue, to be submitted by December 10, 2025.  *Id.*  In the

event the parties could not reach agreement, they were to file their competing proposals by that

date.  *Id.*  After the parties filed their competing proposals, Dkt. Nos. 38, 39, on December 11,

2025, the Court entered a temporary restraining order.  Dkt. No. 40 ("TRO").  The order restrains

and enjoins:

> 1. Defendant Barahona and Defendant BA from possessing, using,
>    or disclosing Plaintiff's trade secrets, specifically:
>
>    a. Plaintiff's confidential customer contract information,
>    including past, current, and prospective customer names and
>    contact information compiled through internal research,
>    years of industry involvement, and/or years of relationship
>    management; confidential sales lead and sales call
>    information and records; confidential information related to
>    pricing, discount information, and payment terms offered to
>    customers and potential customers; compilations of customer
>    demands, preferences, feedback and needs; and previous
>    discussions with customers regarding prior, current, and
>    potential new sales campaigns and strategies ("**Customer
>    Information**");
>
>    i. Plaintiff's confidential sales reports containing
>    detailed customer pricing information for specific
>    customers, customer discounting information, and
>    customer ordering information for Plaintiff's
>    products ("**Sales Information**");
>
>    ii. Confidential delivery routes and schedules that we
>    have developed and refined over many years and that
>    are designed to, among other things, ensure that our
>    drivers' routes are as efficient as possible and that
>    sales and delivery personnel arrive at each customer's
>    site on the days and at the times likely to lead to the
>    greatest sales ("**Delivery Information**");
>
>    iii. Plaintiff's confidential market analysis and

---

[11] Despite Defendants' contentions to the contrary, BNF's second motion for a temporary
restraining order did not constitute an improper attempt at obtaining reconsideration.

forecasting reports containing proprietary analyses of specific market trends, market pricing information trends, and target markets for selling Plaintiff's products based on market conditions and financial analysis ("**Market Information**");

iv. Plaintiff's confidential vendor contract information, including past, current, and prospective vendor names and contact information compiled through internal research and years of industry involvement; confidential information related to pricing, vendor quote history, discount information, and payment terms offered by vendors or potential vendors; analyses of vendor reliability, reputation, product offerings, and speed and accuracy of order fulfillment; and prior discussions with vendors concerning Plaintiff's prior, current, and potential new sales campaigns and strategies ("**Vendor Information**") (collectively, Plaintiff's "**Trade Secrets**")

b. Defendant Barahona and Defendant BA from continuing to do business with any past or present customer or vendor of Plaintiff whose identity and/or business relationship with Plaintiff Mr. Barahona learned of during his employment with Plaintiff, but only to the extent that Defendant Barahona and Defendant BA are/have been selling to said customer or buying from said vendor the same products that were being sold or bought by Plaintiff on or before October 1, 2025;

c. Defendant Barahona and Defendant BA from deleting, destroying, altering, transmitting, or moving any hard-copy or digital/electronic documents, writings, data, or files that contain any of Plaintiff's Trade Secrets or other confidential, proprietary information belonging to Plaintiff; and

d. Defendant Barahona and Defendant BA from deleting, destroying, altering, or transmitting any hard-copy or digital/electronic invoices, bills of sale, spreadsheets, check copies, bank statements, credit card statements, purchasing histories, delivery schedules, and/or other documents, writings, data, or files that evidence, memorialize, refer, or relate to any actual or potential purchase, order, sale, or delivery between (i) any past or present customer or vendor of Plaintiff, and (ii) Defendant Barahona or Defendant BA.

TRO at 2-3.  The order also requires:

2. Defendant Barahona and Defendant BA to (i) provide an accounting to Plaintiff, no later than January 26, 2026, of all of Plaintiff's Trade Secrets and other property in his/its possession, custody, or control, including anything obtained by Defendant Barahona from Plaintiff at any time during his employment with Plaintiff, and (ii) to return all such Trade Secrets and other property to Plaintiff no later than January 30, 2026, along with a written

> certification, signed under penalty of perjury, that Defendant
> Barahona and Defendant BA have returned to Plaintiff all Trade
> Secrets and other property in his/its possession, custody, or control
> that belongs to Plaintiff[.]

*Id.* at 2. The ordered also directed Defendants to show cause why a preliminary injunction should

not issue. *Id.* at 4. They filed a response to the order to show cause on December 17, 2025.[12]

Dkt. No. 43. BNF's reply followed on December 19, 2025.[13] Dkt. No. 44. The Court held a

hearing on December 22, 2025. Dkt. No. 53.

## II.    LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter*

*v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citation omitted). "A plaintiff seeking a

preliminary injunction must establish [1] that [it] is likely to succeed on the merits, [2] that [it] is

likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of

equities tips in [its] favor, and [4] that an injunction is in the public interest." *Id.* at 20 (citations

omitted). The Ninth Circuit "employ[s] a 'sliding scale test,' which allows a strong showing on

the balance of hardships to compensate for a lesser showing of likelihood of success." *Where Do*

*We Go Berkeley v. Cal. Dep't of Trans.*, 32 F.4th 852, 859 (9th Cir. 2022) (citing *All. for the Wild*

*Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011)). Under this approach, "when

plaintiffs establish that the balance of hardships tips sharply in their favor, there is a likelihood of

irreparable injury, and the injunction is in the public interest, they need only show 'serious

questions' on the merits." *Id.* (citing *All. for the Wild Rockies*, 632 F.3d at 1135).

///

///

///

///

---

[12] Before filing its response to the order to show cause, BA also filed its answer and counterclaims against BNF. Dkt. No. 42. Plaintiff highlights that some of Defendants' filings were filed late. The Court nonetheless considers them, though it may strike untimely filings by either party in the future.

[13] In its reply, BNF raises certain evidentiary objections. Because BNF prevails even when the evidence that is the subject of its objections is considered, they are **OVERRULED AS MOOT**.

1  III.    DISCUSSION

2       The Court takes up the *Winter* factors in turn.

3       A.    **Likelihood of Success on the Merits**

4       BNF seeks a preliminary injunction based on its trade secrets and common law trademark

5  claims.  Because, as discussed below, BNF has established at least serious questions as to the

6  merits of its federal trade secrets claim, the Court does not address the others.

7       "The Defend Trade Secrets Act ('DTSA') provides a federal cause of action for

8  misappropriation of trade secrets."  *Quintara Biosciences, Inc. v. Ruifeng Biztech, Inc.*, 149 F.4th

9  1081, 1085 (9th Cir. 2025).  "To succeed on a claim for misappropriation of trade secrets under

10  the DTSA, a plaintiff must prove: (1) that the plaintiff possessed a trade secret, (2) that the

11  defendant misappropriated the trade secret; and (3) that the misappropriation caused or threatened

12  damage to the plaintiff."  *InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 657-58 (9th

13  Cir. 2020) (citing 18 U.S.C. § 1839(5)).  "Trade-secret cases start from the important premise that

14  the definition of what may be considered a trade secret is broad."  *Quintara Biosciences, Inc.*, 149

15  F.4th at 1085 (internal quotations and citations omitted).  The "DTSA's definition of a trade secret

16  includes 'all forms and types of financial, business, scientific, technical, economic, or engineering

17  information' that 'the owner thereof has taken reasonable measures to keep . . . secret' and that

18  'derives independent economic value, actual or potential, from not being generally known to . . .

19  another person."  *Id.* at 1087 (citing 18 U.S.C. § 1839(3)).  "To prove ownership of a trade secret,

20  plaintiffs must identify the trade secrets and carry the burden of showing they exist."  *InteliClear,*

21  *LLC*, 978 F.3d at 658 (internal quotations and citation omitted).  "The plaintiff 'should describe

22  the subject matter of the trade secret with *sufficient particularity* to separate it from matters of

23  general knowledge in the trade or of special knowledge of those persons . . . skilled in the trade.' "

24  *Id.*

25       Applying these principles here, BNF has proffered sufficient evidence to raise substantial

26  questions on the merits.  The current record shows that BNF has cultivated trade secrets in the

27  form of sufficiently defined Sales Information, Delivery Information, Market Information, and

28  Vendor Information over the course of the nearly 15 years it has been in business.  *See, e.g.*, 1st

United States District Court
Northern District of California

Fernández Decl. ¶¶ 3, 4, 6, 8; 2d Fernández Decl. ¶¶ 14, 16, 17.  It also establishes that BNF takes steps to maintain the confidentiality of this information, including by limiting its dissemination within the company, password-protecting files, and providing verbal guidance to employees on the handling of confidential and sensitive information.  1st Fernández Decl. ¶ 11; 2d Fernández Decl. ¶¶ 11, 15, 19, 20.

BNF has also offered evidence that Defendants are misappropriating this information.  For example, it offers evidence of sales by BA to BNF customers, even during Barahona Castillo's tenure at BNF.  *See, e.g.*, 1st Fernández Decl. ¶¶ 19, 26, 27.  It has also offered evidence of BA arriving just days before BNF would have otherwise made deliveries to certain customers, effectively tying-up funds that customers would have allocated to purchases from BNF.  *See* Troupe Decl. ¶¶ 2-6.

Finally, BNF has offered evidence of actual or threatened damage.  BNF has experienced a "highly abnormal" decline in sales for the year.  *See* 2d Fernández Decl. ¶ 5.  It has lost a longtime customer, *see* 1st Fernández Decl. ¶ 28, and it continues to mend relationships with customers caught in the middle.  *See id.* ¶ 23.

Based on the foregoing, BNF has established substantial questions on the merits of its DTSA claim.  Accordingly, the first *Winter* factor favors BNF.

### B.    Irreparable Harm

A plaintiff seeking a preliminary injunction must demonstrate "that irreparable injury is likely in the absence of an injunction."  *Winter*, 555 U.S. at 22.  "A plaintiff must do more than merely allege imminent harm sufficient to establish standing; a plaintiff must demonstrate immediate threatened injury as a prerequisite to preliminary injunctive relief."  *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988) (citation omitted).  "Irreparable harm is traditionally defined as harm for which there is no adequate legal remedy, such as an award of damages."  *Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014) (citation omitted).

"Courts in this district have 'presume[d] that Plaintiff will suffer irreparable harm if its proprietary information is misappropriated.' "  *Comet Techs. United States of Am. Inc. v.*

*Beuerman*, No. 18-CV-01441-LHK, 2018 WL 1990226, at *5 (N.D. Cal. Mar. 15, 2018) (citations omitted; modification in original).  Given the current record establishing substantial questions on the merits of BNF's trade secret claims, that presumption applies here.  Accordingly, the second *Winter* factor weighs in favor of BNF.

### C. Balance of Equities

To determine the balance of equities, "[a] court must balance the interests of all parties and weigh the damage to each."  *CTIA - The Wireless Ass'n v. City of Berkeley, Cal.*, 928 F.3d 832, 852 (9th Cir. 2019) (internal quotations and citation omitted).

The Court acknowledges the burden any preliminary injunction would place on Defendants, though it is not as substantial as they describe.  Barahona Castillo asserts that such an order "would bar [him] from doing business with any past or present BNF customer or vendor with whom [he] deal[s] and sell[s] different products given BNF's extensive footprint in the small Hispanic market[,]" and "would shut BA down and deprive [his] family of income and cause irreparable harm."  2d Barahona Castillo Decl. ¶ 15.  However, with respect to the limits on Defendants' continued operations, the existing TRO, on which the preliminary injunction will be modeled, is appropriately narrowly tailored.  It restrains and enjoins:

> Defendant Barahona and Defendant BA from continuing to do business with any past or present customer or vendor of Plaintiff whose identity and/or business relationship with Plaintiff Mr. Barahona learned of during his employment with Plaintiff, **but only to the extent that Defendant Barahona and Defendant BA are/have been selling to said customer or buying from said vendor the same products that were being sold or bought by Plaintiff on or before October 1, 2025.**

TRO at 2 (emphasis supplied).

This condition strikes a necessary balance between the parties' competing interests.  On the one hand, Barahona Casillo and his company may continue operations, a reality which is bolstered by his own assertions that "[w]ith very few exceptions (approximately seven overlapping SKUs), the products [BA] carr[ies] are different from those BNF sells."[14]  1st Barahona Castillo Decl. ¶ 9.

---

[14] Because the current TRO, which will largely remain in place as a preliminary injunction, permits Defendants to continue operating, the Court need not reach Defendants' arguments that

United States District Court
Northern District of California

1    On the other hand, it protects BNF from further erosion to its customer goodwill, continued

2    confusion in the market, and any additional reduction in sales potentially achieved through the

3    improper use of its trade secrets.  Accordingly, the Court finds that the balance of equities sharply

4    favors BNF.  *See Cutera, Inc. v. Lutronic Aesthetics, Inc.*, 444 F. Supp. 3d 1198, 1209-10 (E.D.

5    Cal. 2020) (finding the balance of equities favored plaintiff because "a narrowly tailored

6    injunction w[ould] merely prevent [defendant] from engaging in unlawful acts, which it claim[ed]

7    to be avoiding in any event.").

8    **D.**    **Public Interest**

9    "Whereas the balance of equities focuses on the parties, '[t]he public interest inquiry

10    primarily addresses impact on non-parties rather than parties,' and takes into consideration 'the

11    public consequences in employing the extraordinary remedy of injunction.' "  *hiQ Labs, Inc. v.*

12    *LinkedIn Corp.*, 31 F.4th 1180, 1202 (9th Cir. 2022) (quoting *Bernhardt v. Los Angeles Cnty.*, 339

13    F.3d 920, 931-32 (9th Cir. 2003) (modification in original)).  "[T]here is a strong public interest in

14    favor of protecting trade secrets.  *Hunter Consulting, Inc. v. Beas*, No. SACV 12-1947 AG JPRX,

15    2012 WL 6193381, at *5 (C.D. Cal. Dec. 10, 2012).  The Court therefore finds that this factor

16    favors BNF.  California's public policy favoring employee mobility does not warrant a different

17    result.  "[T]he courts have repeatedly held a former employee may be barred from soliciting

18    existing customers to redirect their business away from the former employer and to the employee's

19    new business *if the employee is utilizing trade secret information* to solicit those customers."  *The*

20    *Ret. Grp. v. Galante*, 176 Cal. App. 4th 1226, 1237 (2009) (emphasis in original).

21    Having found that the *Winter* factors weigh in favor of granting preliminary injunctive

22    relief, the Court now turns to whether BNF must post a bond and then examines the appropriate

23    scope of the preliminary injunction to be issued.

24    **E.**    **Bond**

25    Federal Rule of Civil Procedure 65(c) allows courts to "issue a preliminary injunction . . .

26    only if the movant gives security in an amount that the court considers proper to pay the costs and

27

28    preliminary injunctive relief is tantamount to a non-compete clause in violation of California
Business and Professions Code Section 16600.

United States District Court
Northern District of California

1  damages sustained by any party found to have been wrongfully enjoined or restrained."  Fed. R.

2  Civ. P. 65(c); *see Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003) (stating that "[t]he

3  district court may dispense with the filing of a bond when it concludes there is no realistic

4  likelihood of harm to the defendant from enjoining his or her conduct.").  The Court declines to

5  enter a bond because, on the current record, the narrowly tailored restriction on Defendants'

6  operations should not interfere with their ability to engage in legitimate business.

7        **F.      Scope of Injunction**

8        " 'District courts have broad latitude in fashioning equitable relief when necessary to

9  remedy an established wrong.' "  *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1024 (9th Cir.

10 2016) (quoting *Earth Island Inst. v. Carlton*, 626 F.3d 462, 475 (9th Cir. 2010)).  "The 'purpose of

11 a preliminary injunction is to preserve the status quo ante litem pending a determination of the

12 action on the merits.' "  *Id.* (quoting *Sierra Forest Legacy v. Rey*, 577 F.3d 1015, 1023 (9th Cir.

13 2009)).  "The status quo ante litem refers not simply to any situation before the filing of a lawsuit,

14 . . . [which c]ould lead to absurd situations, in which plaintiffs could never bring suit once

15 [unlawful] conduct had begun," but "instead to 'the last uncontested status which proceeded the

16 pending controversy.' "  *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1210 (9th Cir. 2000)

17 (quoting *Tanner Motor Livery, Ltd. v. Avis, Inc.*, 316 F.2d 804, 809 (9th Cir. 1963)); *accord*

18 *Boardman*, 822 F.3d at 1024 (quoting *GoTo.com*, 202 F.3d at 1210).  Equitable relief may "be no

19 more burdensome to the defendant than necessary to provide complete relief to the plaintiffs."

20 *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 779 (9th Cir. 2018) (quoting *Madsen v.*

21 *Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994)).

22        In keeping with above authority, the Court finds the following preliminary injunctive relief

23 appropriate given the current record.  Pursuant to Rule 65 of the Federal Rules of Civil Procedure,

24 the Court hereby **ENJOINS**:

25    1.  Defendant Barahona and Defendant BA from possessing, using, or disclosing Plaintiff's

26        trade secrets, specifically:

27          a.  Plaintiff's confidential customer contract information, including past, current, and

28              prospective customer names and contact information compiled through internal

United States District Court
Northern District of California

research, years of industry involvement, and/or years of relationship management; confidential sales lead and sales call information and records; confidential information related to pricing, discount information, and payment terms offered to customers and potential customers; compilations of customer demands, preferences, feedback and needs; and previous discussions with customers regarding prior, current, and potential new sales campaigns and strategies (**"Customer Information"**);

     i.  Plaintiff's confidential sales reports containing detailed customer pricing information for specific customers, customer discounting information, and customer ordering information for Plaintiff's products (**"Sales Information"**);

     ii.  Confidential delivery routes and schedules that BNF has developed and refined over many years and that are designed to, among other things, ensure that BNF's drivers' routes are as efficient as possible and that sales and delivery personnel arrive at each customer's site on the days and at the times likely to lead to the greatest sales (**"Delivery Information"**);

     iii.  Plaintiff's confidential market analysis and forecasting reports containing proprietary analyses of specific market trends, market pricing information trends, and target markets for selling Plaintiff's products based on market conditions and financial analysis (**"Market Information"**);

     iv.  Plaintiff's confidential vendor contract information, including past, current, and prospective vendor names and contact information compiled through internal research and years of industry involvement; confidential information related to pricing, vendor quote history, discount information, and payment terms offered by vendors or potential vendors; analyses of vendor reliability, reputation, product offerings, and speed and accuracy of order fulfillment; and prior discussions with vendors concerning Plaintiff's prior, current, and potential new sales campaigns and strategies (**"Vendor**

**Information**") (collectively, Plaintiff's **"Trade Secrets"**)

    b.  Defendant Barahona and Defendant BA from continuing to do business with any past or present customer or vendor of Plaintiff whose identity and/or business relationship with Plaintiff Mr. Barahona learned of during his employment with Plaintiff, but only to the extent that Defendant Barahona and Defendant BA are/have been selling to said customer or buying from said vendor the same products that were being sold or bought by Plaintiff on or before October 1, 2025;

    c.  Defendant Barahona and Defendant BA from deleting, destroying, altering, transmitting, or moving any hard-copy or digital/electronic documents, writings, data, or files that contain any of Plaintiff's Trade Secrets or other confidential, proprietary information belonging to Plaintiff; and

    d.  Defendant Barahona and Defendant BA from deleting, destroying, altering, or transmitting any hard-copy or digital/electronic invoices, bills of sale, spreadsheets, check copies, bank statements, credit card statements, purchasing histories, delivery schedules, and/or other documents, writings, data, or files that evidence, memorialize, refer, or relate to any actual or potential purchase, order, sale, or delivery between (i) any past or present customer or vendor of Plaintiff, and (ii) Defendant Barahona or Defendant BA.

In addition, the Court **HEREBY ORDERS**:

2.  Defendant Barahona and Defendant BA to (i) provide an accounting to Plaintiff, no later than January 26, 2026, of all of Plaintiff's Trade Secrets and other property in his/its possession, custody, or control, including anything obtained by Defendant Barahona from Plaintiff at any time during his employment with Plaintiff, and (ii) to return all such Trade Secrets and other property to Plaintiff no later than January 30, 2026, along with a written certification, signed under penalty of perjury, that Defendant Barahona and Defendant BA have returned to Plaintiff all Trade Secrets and other property in his/its possession, custody, or control that belongs to Plaintiff;

3.  No security bond is required for this matter;

1    4.   This Preliminary Injunction is immediately effective upon its entry and shall remain in full

2         force and effect through the date on which judgment is entered following the trial of this

3         action.

4

5         **IT IS SO ORDERED.**

6    Dated: December 24, 2025

7

8                                                              _____

9                                                              **ARACELI MARTÍNEZ-OLGUÍN**
                                                               **United States District Judge**

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

34